COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges O'Brien, Malveaux and Frucci
Argued by videoconference


COMMONWEALTH OF VIRGINIA

v.        Record No. 0332-25-2

IAN LEGALLO-MALONE

MEMORANDUM OPINION* BY
JUDGE MARY BENNETT MALVEAUX
JULY 15, 2025


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
David M. Barredo, Judge

Brooke I. Hettig, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellant.

Bonnie J. Lepold; Bruce R. Williamson, Jr. (Lepold & Martin PLLC,
on brief), for appellee.


Ian Legallo-Malone ("appellee") was indicted for second-degree murder, in violation of

Code § 18.2-32.  Prior to trial, he moved to suppress evidence obtained pursuant to multiple search

warrants.  The trial court denied the motion in part, but granted it as to certain evidence recovered

from appellee's apartment.  In this pretrial appeal, the Commonwealth contends that the trial court

erred to the extent it granted the motion, while appellee assigns cross-error to the extent of the

motion's denial.  For the reasons outlined below, we affirm in part, reverse in part, and remand to

the trial court.

I.  BACKGROUND

On appeal, we view the facts in the "light most favorable" to the respective prevailing

parties below, regarding as true all credible evidence favorable to those parties and all inferences

that may reasonably be drawn therefrom.  *See Meade v. Commonwealth*, 74 Va. App. 796, 802

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

(2022) (quoting *Gerald v. Commonwealth*, 296 Va. 469, 472 (2018)). Here, appellee prevailed below to the extent that the trial court granted his motion to suppress, and the Commonwealth is otherwise the prevailing party. We tailor our recitation of the facts accordingly.

On December 7, 2023, around 6:30 p.m., Robin Legallo spoke with her husband, Phaedrus Acgtblu, on the phone. She texted him just after 7:00 p.m., but he never responded. Around 10:00 p.m. that evening, Robin found Acgtblu stabbed to death in his home in Charlottesville, Virginia. Robin called 911, and police went to the home to investigate.

Robin also called her son, appellee, who was living in Richmond attending Virginia Commonwealth University (VCU) at the time. When Robin told appellee that Acgtblu was dead, appellee asked, "What happened? Was it a heart attack?" Robin responded that Acgtblu's death was being investigated. Appellee replied, "I'm sorry. Do you want me to come home?" and then offered, "if you need me to come home, I will." Robin told police about this call and gave them appellee's address.

Police also interviewed Robin's daughter, Quinn Legallo-Malone. When they asked if anyone would want to hurt Acgtblu, Quinn responded, "Yeah. . . . He and [appellee] really did not get along." She also reported that appellee "had a really bad relationship" with Acgtblu because Acgtblu "was not kind to [appellee] at a young age" and that appellee had stated that Acgtblu had "been physically abusive towards him . . . when he was a child" both "[i]n a physical violence sort of way and possibly in a sexual sort of way." Quinn had heard appellee, while drunk, say that he wished Acgtblu were dead and that he "thought it could look like a suicide or something." In July 2023, appellee had said "[t]hat [Acgtblu] would die in six months and it would look like a suicide."

In a later interview with police, Robin stated that appellee had been driving her Subaru. Upon reviewing data in the VCU police department's License Plate Reader (LPR) system, police

discovered that a Subaru registered to Robin had been in Richmond "roughly two- and one-half hours after [Acgtblu] was last known to be alive and less than two hours from the unresponsive text" that Robin had sent on December 7. Based on the images from the LPR system, the car was seen turning onto "the most direct route to [appellee's] apartment . . . in the area of Interstate 95 which would be the route of travel if the vehicle had been traveling east on Interstate 64," which was "the most direct and fastest route from Charlottesville to Richmond."

## A. CTLI Warrant

Based on this information, on the afternoon of December 8, 2023, police obtained a search warrant (the "CTLI warrant") for comprehensive data records related to appellee's cell phone number, including its cell tower location information (CTLI). The supporting affidavit described the timeline of events on December 7, and the information obtained from the VCU LPR system. It recounted the interviews with Robin and Quinn, including Robin's phone conversation with appellee on the night of December 7, and Quinn's report that, in July, appellee had said Acgtblu would die in six months and that it would look like a suicide. The affidavit also described the crime scene, noting that Acgtblu sustained "multiple stab wounds to the torso, back, neck, and a large laceration to the left upper arm and forearm"—many of the wounds "were consistent with defensive wounds"—and that two knives were found thirty feet from Acgtblu. Police were seeking cell records "to determine patterns of movement and patterns of communication."

## B. Warrantless Seizure of Appellee's Phone and Car

On the evening of December 8, 2023, Quinn called 911 and requested that police come to Acgtblu's home because appellee, whom she referred to as "the main suspect" in "a murder" was on his way there. Quinn told the 911 operator that she and her family were leaving the house; the operator could hear people "yellin[g] and screaming." Robin, who was with Quinn, told the

operator that appellee "is a person of interest and he, despite us telling him not to, he is coming home." Robin did not know whether appellee had any weapons.

Police intercepted appellee, and Detective Michael Wells approached and spoke with him. Wells noted that he did not initially plan to seize the car and phone; he was "more interested in [police] safety and the safety of the community and trying to interact with [appellee]" because his family was "frightened and wanted [police] to respond." Wells told appellee "he was not under arrest . . . but not free to go at this time. He was . . . in investigative custody." Wells was aware that police had already obtained the CTLI warrant, which made him believe "that [appellee's] car and phone may have evidence" inside. While talking to appellant, Wells saw appellee's phone as well as two separate pieces of rope, which he found "concerning" because it "could have been for him to hang himself or . . . tie up his family." Appellee refused to talk to Wells and said he wanted a lawyer.

Police decided to seize the car and appellee's phone out of concern that those items could contain "potential evidence that could be destroyed." Wells informed appellee that police would be seeking a search warrant, because although Wells felt that he could have searched the car "under the *Carroll* [d]octrine,"[1] he thought it would be "prudent" to obtain a search warrant for both the phone and the car.

C. Search Warrants for Appellee's Phone, Car, and Person

Later on the evening of December 8, police obtained search warrants for appellee's phone and the car's electronic records. On December 9, they obtained a warrant for the car itself. On December 10, they also obtained a warrant for appellee's person, including a buccal swab, biological material, fingerprints, and photographs.

---

[1] *Carroll v. United States*, 267 U.S. 132 (1925).

D. Apartment Search Warrants

Also on December 10, police obtained a search warrant for appellee's apartment in Richmond (the "first apartment warrant").  The warrant authorized a search for "[a]ny biological material, knives or similar sharped instruments, routers, modems, any flannel shirt colored purple/black/gray, any black undershirt, any gray or light colored pants, any black shoes, electronic entry card/module for [the apartment], any item illustrating dominion and control of the residence."  While executing the warrant the following day, Detective Nicholas Richardson looked in a bathroom wastebasket "for any items of dominion and control or DNA."  Inside the wastebasket were several folded pages torn from a notebook.  Richardson unfolded the pages, "[i]mmediately looked" at them, and "could immediately tell that one of the papers appeared to be a suicide note addressed to [Robin] and [Acgtblu's] sons . . . written from the perspective of [Acgtblu]."  Another page "appeared to be a checklist or a to-do list . . . for the homicide that showed problems such as alibi, locations, evidence to worry about."  The third page appeared to be a draft apology note to Robin and an attempt at signing Acgtblu's name.

Realizing that the pages "were important to the case and evidence to the case," Richardson photographed them, refolded them, and placed them back in the wastebasket.  He believed the pages fell under items related to dominion and control over the residence, but "out of an abundance of caution," police decided to obtain a second warrant for them.

On December 11, 2023, police obtained a second search warrant for appellee's apartment (the "second apartment warrant"), this time authorizing a search for "[a]ny handwritten papers and notes" as well as a Dell laptop.  They executed the warrant that same day, and recovered the papers Richardson had photographed, a journal, two notebooks, a post-it note, and the laptop.

E. Motion to Suppress and Trial Court Rulings

Appellee filed a motion to suppress "all evidence obtained unlawfully." At the suppression hearing, crime scene investigator Jason Scarlata testified that looking in a bathroom wastebasket was "relevant" to a search for the items listed in the first apartment warrant, because the wastebasket could contain DNA evidence such as blood serum or other "biological fluid," or dominion and control evidence such as mail. Specifically, "[a]ny handwritten notes contain DNA," namely, "epithelial DNA," and therefore "a piece of paper with handwriting . . . would be a good way to compare DNA."

The trial court denied appellee's motion as to the CTLI warrant, holding that "the four corners of the warrant establish probable cause." It also denied the motion as to the warrantless seizure of appellee's phone and car. In doing so, the court found that both the car and phone "are easily transported," that the crime scene "was a bloody one, so there was a need to preserve DNA or biological evidence" which "certainly can be cleaned," and that the phone could "easily be wiped clean, damaged, and/or lost," so "exigent circumstances supported the seizures of those items to allow law enforcement reasonable time to obtain search warrants." Finally, the court denied the motion as to the search warrants for the phone, car and its electronic records, and appellee's person; the court based this ruling on its finding that the CTLI warrant was supported by probable cause.

However, the court granted appellee's motion "as to the handwritten papers" that Richardson observed and photographed while executing the first apartment warrant "because the execution of the search warrant exceeded the scope" of the warrant. The court also granted the motion as to those same papers retrieved pursuant to the second apartment warrant. The court denied the motion with respect to all other evidence obtained under both apartment search warrants.

## II. ANALYSIS

In reviewing a lower court's ruling on a motion to suppress, "[t]his Court is 'bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them,'" *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020)), which requires us to "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers," *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 169 (2008)). However, "we 'review[] *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment.'" *Parady v. Commonwealth*, 78 Va. App. 18, 29 (2023) (alteration in original) (quoting *Williams*, 71 Va. App. at 475). In regard to our review of the trial court's partially denying the motion to suppress, it is appellee who "bears the burden of establishing that reversible error occurred." *Id.* (quoting *Mason v. Commonwealth*, 291 Va. 362, 367 (2016)).

### A. First Apartment Warrant

The Commonwealth argues that the papers found in the wastebasket did not exceed the scope of the first apartment warrant because police found them while searching for biological evidence and/or evidence of dominion and control over the apartment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Thus, by its express terms, it protects not only the individual, but also his or her things[] and . . . home from unreasonable searches." *Saal v. Commonwealth*, 72 Va. App. 413, 421 (2020). Because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Jones v. Commonwealth*, 71 Va. App. 375, 380-81 (2019) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)), "[a] search must be conducted in a reasonable manner," *Rosa v. Commonwealth*, 48 Va. App. 93, 98 (2006).

"The permissible scope of a search is limited by the terms of the warrant pursuant to which it is conducted." *Dotson v. Commonwealth*, 47 Va. App. 237, 243 (2005) (quoting *Kearney v. Commonwealth*, 4 Va. App. 202, 204 (1987)). But "[a] search may be as extensive as reasonably required to locate the items described in the warrant." *Id.* (quoting *Kearney*, 4 Va. App. at 205-06). Further, "[a] search warrant . . . is not invalid merely because officers seize items not named in the warrant." *Id.* (alterations in original) (quoting *Cherry v. Commonwealth*, 21 Va. App. 132, 138-39 (1995)).

Here, police were authorized to search for evidence of "dominion and control" over the apartment, such as mail, as well as "[a]ny biological evidence," such as DNA or bodily fluid. It was reasonable that Richardson would be looking for such items in a bathroom wastebasket. Police were also aware that handwritten notes could contain "epithelial DNA." Richardson was therefore acting within the scope of the search warrant when specifically looking for pieces of paper, particularly those that contained handwriting. *See Rosa*, 48 Va. App. at 98 (noting that "the scope of a search extends to every place where the object of the search may reasonably be found"). He was still within the scope of the warrant when he removed the papers from the wastebasket and unfolded them, because he needed to at least briefly examine the papers to determine whether they presented a basis for comparison to appellant's DNA, or for demonstrating dominion and control over the residence. *See Kearney*, 4 Va. App. at 205 ("A lawful search of premises described in a warrant 'extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.'" (quoting *United States v. Ross*, 456 U.S. 798, 820-21 (1982))); *Rosa*, 48 Va. App. at 100-01 ("In a search for tangible documents, 'it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.'" (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976))). Upon looking at the

- 8 -

papers, Richardson "could immediately tell" that they had evidentiary value, which demonstrates that his initial review was only cursory so that he could determine whether the papers were within the scope of the warrant. Such cursory review was reasonable. *See Rosa*, 48 Va. App. at 100-01. Accordingly, we hold that the trial court erred in granting the motion to suppress as to the papers, because the police's actions here were reasonable and within the scope of the first apartment warrant.[2]

## B. CTLI Warrant

In his first assignment of cross-error, appellee argues that the affidavit supporting the CTLI warrant did not demonstrate probable cause.

To determine whether an affidavit was sufficient to support a search warrant, we look to the "totality of the circumstances." *Hicks v. Commonwealth*, 281 Va. 353, 359 (2011). "[I]t is well settled 'that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review.'" *Anzualda v. Commonwealth*, 44 Va. App. 764, 775 (2005) (en banc) (quoting *Tart v. Commonwealth*, 17 Va. App. 384, 388 (1993)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Hicks*, 281 Va. at 360 (second and third alterations in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). "Additionally, when we review the magistrate's decision to issue the warrant, we must grant 'great deference' to the magistrate's finding of probable cause." *Id.* (quoting *Garza v. Commonwealth*, 228 Va. 559, 563 (1984)).

"Probable cause for issuance of a search warrant exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* at 359 (quoting *Jones v.*

---

[2] Because we find that the papers were properly recovered under the first apartment warrant, we need not reach the Commonwealth's argument regarding the second apartment warrant. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("As we have often said, 'the doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available."'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

*Commonwealth*, 277 Va. 171, 178 (2009)). "A magistrate is entitled to draw reasonable inferences about where incriminating evidence is likely to be found, based on the nature of the evidence and the type of the offense." *Cunningham v. Commonwealth*, 49 Va. App. 605, 613 (2007) (quoting *Gwinn v. Commonwealth*, 16 Va. App. 972, 975 (1993)).

Appellee contends that the affidavit supporting the CTLI warrant constituted a "fishing expedition" based on "boilerplate assertions about the detective's training and experience" rather than objective facts. It is true that "an affidavit that is devoid of material facts and sets forth only conclusory allegations is 'bare bones' and insufficient to support probable cause." *Sowers v. Commonwealth*, 49 Va. App. 588, 603 (2007) (quoting *United States v. Leon*, 468 U.S. 897, 915 (1984)). But even where an affidavit contains "a conclusory statement by an unidentified informant, whose veracity and basis of knowledge were not established . . . that fact is not fatal to the magistrate's determination that probable cause existed." *Gwinn*, 16 Va. App. at 976. Rather, "when other evidence exists in the affidavit, which independently establishes probable cause" without having to consider such a statement, "the magistrate's decision to issue a search warrant will not be disturbed because the supporting affidavit contained some evidence which, standing alone, would be insufficient to establish probable cause." *Id.*

We conclude that the affidavit supporting the CTLI warrant was sufficient, despite the fact that it contained some conclusory statements, because the affidavit also contained objective facts: the timeline of events on the night of December 7; the details of Robin's phone call to appellee; Quinn's report that appellee and Acgtblu had a "really bad relationship"; and appellee's statement that Acgtblu would die and that "it would look like a suicide." These facts were sufficient to establish probable cause even if the conclusory statements were not included in the affidavit. What is more, Robin and Quinn were not "unidentified informants" but close relatives of appellee; those

relationships supported the finding that they had some basis of knowledge of the facts they relayed.[3]

The affidavit also relayed information obtained from VCU's LPR system that, a reasonable person could infer, placed appellee as returning to Richmond from Charlottesville within the timeframe of the killing. This particular fact establishes the nexus between appellee's phone and the offense: the phone could show appellee's proximity to the crime in time and place, and police could compare the timeline of his movements with the timeline Robin described. Taken in totality, these facts provided probable cause to believe appellee's phone may contain incriminating location information, and thus we affirm the trial court's denial of appellee's motion to suppress the evidence obtained pursuant to the CTLI warrant.[4]

## C. Warrantless Seizure

Appellee's third assignment of cross-error challenges the trial court's finding that exigent circumstances justified the seizure of his car and phone.[5]

---

[3] Appellee argues that Quinn's statements were hearsay and that Quinn lacked personal knowledge that appellee was involved in the killing. But our Supreme Court has previously held that a person relaying information who "was identified in the affidavit . . . was not a confidential or anonymous informant whose reliability had to be demonstrated." *Thomas v. Commonwealth*, 263 Va. 216, 228 (2002). The affidavit here identified Quinn as Acgtblu's stepdaughter and appellee's sister. The police were therefore justified in relying on Quinn's statements to support the affidavit, because Quinn was identified as a close relative.

[4] In his second assignment of cross-error, appellee contends that the four warrants for his phone, person, car, and the car's electronic records were all defective because they were "based either wholly or substantially" on the same assertions in the affidavit for the CTLI warrant, and thus they were issued without probable cause. Because the affidavits supporting these four warrants contain the same assertions as the CTLI warrant, and because the trial court based its ruling on its finding that the CTLI warrant was supported by probable cause, our conclusion that that finding is correct is dispositive of appellee's argument regarding the four additional warrants. Accordingly, we need not address his second assignment of cross-error. *See Mayr v. Osborne*, 293 Va. 74, 86 n.4 (2017) (declining to address an assignment of error that was "moot" as a result of the Court's disposition of another assignment of error); *see also Butcher*, 298 Va. at 396.

[5] Appellee's third assignment of cross-error also addresses the trial court's finding that appellee's temporary detention was lawful, and its "not ruling explicitly on the issue of probable

- 11 -

"Warrantless searches, of course, are *per se* unreasonable, subject to a few well-defined exceptions." *Moore v. Commonwealth*, 69 Va. App. 30, 36 (2018) (quoting *Abell v. Commonwealth*, 221 Va. 607, 612 (1980)). "One well-recognized exception applies when 'the exigencies of the situation,' coupled with probable cause, 'make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Moreno*, 73 Va. App. at 275 (alteration in original) (quoting *Carpenter v. United States*, 585 U.S. 296, 319 (2018)). While the exigent circumstances exception usually applies in the context of a search, we have previously held that exigent circumstances may support a warrantless seizure of evidence. *See, e.g.*, *Moore*, 69 Va. App. at 37, 40-41 (holding that exigent circumstances justified the warrantless seizure of a firearm in plain view inside a vehicle); *Moreno*, 73 Va. App. at 273, 277 (exigent circumstances supported the warrantless acquisition of real-time cell site location information from fleeing suspect's cell phone); *Fitch v. Commonwealth*, No. 1981-23-2, slip op. at 15 (Va. Ct. App. Sep. 24, 2024) ("Considering the totality of the circumstances, the trial court did not err in finding that probable cause and exigent circumstances justified the [warrantless] seizure of Fitch's phone."). The Fourth Circuit has also applied the exigent circumstances exception to the warrantless seizure of items. *E.g.*, *United States v. Burton*, 756 F. App'x 295, 298 (4th Cir. 2018) ("As an exception to the general warrant requirement, law enforcement officers may seize an item without a warrant if the officers have probable cause to believe that the item contains contraband or evidence of a crime, and 'the exigencies of the circumstances demand it.'" (quoting *United States v. Place*, 462 U.S. 696, 701 (1983))); *United*

---

cause." Appellee does not advance any argument or cite any caselaw related to these issues. We find this omission significant and conclude that these issues are waived. *See* Rule 5A:20(e) (requiring a brief to contain "argument (including principles of law and authorities) relating to each assignment of error"); *Conley v. Commonwealth*, 74 Va. App. 658, 681-82 (2022) (holding that, because appellant "provide[d] no legal argument or authority in his brief to support his argument" and the omission was "significant," the argument was waived).

*States v. Brown*, 701 F.3d 120, 126 (4th Cir. 2012) ("The types of exigent circumstances that may justify a warrantless seizure include, inter alia, the imminent destruction of evidence.").

Exigent circumstances "arise when the very nature of an event demands an immediate response from law enforcement." *Moore*, 69 Va. App. at 36. "'To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, [a c]ourt looks to the totality of circumstances[,]' examining those 'circumstances as they reasonably appeared to the law enforcement officers on the scene.'" *White v. Commonwealth*, 73 Va. App. 535, 554 (2021) (alterations in original) (first quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013); and then quoting *Verez v. Commonwealth*, 230 Va. 405, 411 (1985)). While there is no "exhaustive enumeration of factors that would distinguish circumstances that qualify as exigent from those that would not," each case requires that police had probable cause at the time of their action "to believe that cognizable exigent circumstances were present." *Moore*, 69 Va. App. at 37 (first quoting *Evans v. Commonwealth*, 290 Va. 277, 283 (2015); and then quoting *Keeter v. Commonwealth*, 222 Va. 134, 141, *cert. denied*, 454 U.S. 1053 (1981)). "Officer safety and the fear that evidence will be destroyed before a warrant can be obtained are key justifications for the exigent circumstances exception to the Fourth Amendment warrant requirement." *Parady*, 78 Va. App. at 30-31. Additional factors "relevant to determining exigent circumstances include: 'the degree of urgency involved and the time required to get a warrant; . . . the possibility of danger to others; . . . whether the offense is serious, or involves violence; . . . [and] the likelihood of escape if the suspects are not swiftly apprehended." *Moreno*, 73 Va. App. at 276 (alterations in original) (quoting *Commonwealth v. Campbell*, 294 Va. 486, 495 (2017)).

In this case, when Wells first approached appellant, his main concern was police safety and safety of the community. But his interaction with appellant, combined with the information he already knew, gave him probable cause to believe that not only officer safety and the safety of

others, but also the preservation of evidence, was at stake.  The offense in question was a violent stabbing, and Wells was aware that Acgtblu's family was "frightened."  This gave the police responding to the call reason to fear for their safety, particularly because Quinn described appellee as "the main suspect" in a "murder" investigation.  Robin also reported that she was unsure whether appellee had any weapons and that he was coming home despite being told not to do so.  Further, Wells observed pieces of rope in the car, causing him to suspect that appellee intended to hang himself or tie up his family.

Wells also had probable cause to believe that the car could contain biological evidence. He knew that appellee was a person of interest in a murder, an offense likely to generate such evidence in the form of hair, blood, and/or DNA and that police had already obtained the CTLI warrant.  And as the trial court noted, both the car, the phone, and their contents could easily be cleaned, deleted, or moved, and a phone is relatively easy to lose or destroy.  *See Moreno*, 73 Va. App. at 277; *see also Burton*, 756 F. App'x at 298 (holding that a warrantless seizure of a suspect's cell phones "was justified under the exigent circumstances exception to the warrant requirement" based on both the existence of probable cause and the police having "good reason to fear" that digital evidence would be destroyed).  Thus, the preservation of evidence was a valid and urgent concern based on the nature of the items themselves.  Finally, the car itself gave appellee a swift means of escaping with potential valuable evidence including the phone, which was already the subject of the CTLI warrant and which Wells saw in plain view.  Wells was therefore justified in his concern that "potential evidence . . . could be destroyed" if he did not seize the car and phone.  And ultimately, the police did not actually search the phone, car, or the car's electronic records until they obtained search warrants.[6]  We conclude that the police were

---

[6] The affidavits supporting the search warrants for the phone, car, and the car's electronic records contain the same facts as those supporting the CTLI warrant, which police obtained prior

- 14 -

justified in that seizure and that the trial court did not err in denying appellee's motion to suppress evidence obtained therefrom.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment as to its granting the motion with respect to the papers found in the wastebasket, affirm the trial court's judgment as to its denying the motion in all other respects, and remand the matter to the trial court for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

---

to Wells's interaction with appellee, plus additional information obtained either independently of the seizure or under a later search warrant.